UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Kenmode Tool & Engineering, Inc.,

File No. 24-cv-3756 (ECT/EMB)

    Plaintiff and Counter
    Defendant,

v.

**OPINION AND ORDER**

Technical Plating, Inc.,

    Defendant and Counter
    Claimant.

Erica Sarver, Bodman PLC, Detroit, MI, Stephen Paul Dunn, Bodman PLC, Troy, MI, and Brandie L. Morgenroth and Kelly P. Magnus, Nilan Johnson Lewis PA, Minneapolis, MN, for Plaintiff and Counter Defendant Kenmode Tool & Engineering, Inc.

Justice Ericson Lindell, Greenstein Sellers PLLC, Minneapolis, MN, for Defendant and Counter Claimant Technical Plating, Inc.

A contract provided that Technical Plating would process certain metal parts for Kenmode, and Kenmode would pass those parts on to its customer. When the customer noticed defects in the parts, Technical Plating attempted to resolve the problem and offered Kenmode credits to cover potential liability. Technical Plating then stopped providing credits. Kenmode sued for breach of contract and several warranties, and Technical Plating counterclaimed for a declaratory judgment that it had satisfied any liability under the contract.

The parties filed cross-motions for summary judgment, and both motions will be granted in part and denied in part. The contract has a provision limiting Technical Plating's

liability, and though it is enforceable as a matter of law, there is a factual question whether it was waived. Even if it were not waived, Technical Plating has pointed out disputed record evidence making breach a question for the factfinder. Kenmode's motion will be granted as to Technical Plating's redundant counterclaim and otherwise denied.

I[1]

*Kenmode manufactures metal goods and Technical Plating provides plating services.* Kenmode Tool & Engineering, Inc., manufactures metal stampings for automotive, medical, defense, and other industries. ECF No. 67-1 at 9:24–10:17. Kenmode contracts with other businesses for materials and services, *id.* at 10:18–22, and has experience negotiating those contracts, *id.* at 11:14–25 (noting that Kenmode has been in business for sixty-five years). Technical Plating, Inc., is one of its business partners. *Id.* at 16:9–13. Technical Plating provides metal plating for conductor pins. *Id.* at 29:22–30:2. In a nutshell, Kenmode would send parts to Technical Plating, which would apply a metal plating and ship them back to Kenmode, which would them send the parts to Kenmode's customers. *Id.* at 18:8–14.

*Kenmode and Technical Plating formed a contract.* Kenmode and Technical Plating formed a contractual agreement spread out in three documents: the Quotation, the Terms and Conditions, and the Blanket Purchase Order. Compl. [ECF No. 1] ¶¶ 11–16; ECF No. 15 at 2 ¶ 5 (Answer admitting allegation). In the Quotation, Technical Plating quoted a price and quantity for its processing and finishing. ECF No. 1-1 at 2. The

---

[1]    Unless otherwise noted, the facts are undisputed.

2

Quotation made "[a]ll orders . . . subject to [Technical Plating's] Terms and Conditions." *Id.* The Terms and Conditions laid out "the entire agreement between parties." ECF No. 1-2 at 2; *see* ECF No. 67-1 at 24:12–16. In that document, Technical Plating warranted that "processing and finishing shall meet customer's specifications supplied in writing with the order and that work processing and finishing shall be free from defect in material or workmanship." ECF No. 1-2 at 2. The third document is the Blanket Purchase Order, in which Kenmode ordered metal plating at a specified thickness from Technical Plating. ECF No. 1-3 at 2. The contract provided that Kenmode would ship conductor pins—"the Parts"—to Technical Plating, which would apply the metal plating and ship the Parts back to Kenmode. *Id.*; ECF No. 67-1 at 30:25–31:10.

*The Terms and Conditions limited Technical Plating's liability.* The Terms and Conditions included a damages cap. ECF No. 1-2 at 2. In full, it reads: "[Technical Plating's] liability for any cause is limited to the cost of direct labor and material of product loss directly damaged by [Technical Plating's] processing or two times [Technical Plating's] processing charges on such material, whichever is the lesser. [Technical Plating's] pricing is based on this policy, limiting liability." *Id.*[2]

*Technical Plating performed the services at a cost of $19,649.19.* "Tech[nical] Plating performed the plating and finish services and shipped the Parts to Kenmode." ECF No. 72-2 ¶ 5. The processing charges for this task totaled $19,649.19. ECF No. 15 at 7

---

[2]   Earlier in this litigation, the parties disputed the applicability and meaning of the contract's notice requirement. *See, e.g.*, ECF No. 27 at 6–7. The parties agree that this issue is off the table for purposes of summary judgment.

¶ 7 (Counterclaim); ECF No. 15-1 (invoices); ECF No. 16 at 2 ¶ 7 (Answer to Counterclaim admitting that the invoice collection "speaks for itself"); ECF No. 67-3 (showing invoice totals). Kenmode's Vice President of Operations, Thomas Skibinski, agreed that the processing charges equaled the sum of the figures in the "Extended Purchase Cost" column of Exhibit 3. ECF No. 67-1 at 41:22–42:2; *see* ECF No. 67-3 (Exhibit 3); ECF No. 67 ¶ 4. That sum is $19,647.50554, a rounding error off from $19,649.19. ECF No. 67-3; *see* ECF No. 65 at 5 & n.1 (explaining rounding error). Technical Plating shipped the Parts to Kenmode, which shipped the Parts to its customer.[3] ECF No. 72-2 ¶¶ 5–6.

*The Parts had solderability problems, and Kenmode and Technical Plating attempted to determine the root cause.* "Kenmode's customer notified Kenmode on October 2, 2023, that the plating applied by Tech[nical] Plating to the Parts was incorrect and defective, and not in accordance with the applicable specifications." *Id.* ¶ 7; ECF No. 72-4 at 3 (email from customer to Kenmode). Kenmode informed Technical Plating on October 4 that the customer was "having solderability issues" and asked if "the plating is normal as the certification demonstrates." ECF No. 72-5 at 2. The source of the problem is disputed. Kenmode asserts that "the defects with the Parts were caused by Tech[nical] Plating's failures to use the correct program to verify the coating thickness of the plating."

---

[3]    In the pleadings, there was some dispute about this point. The Complaint asserted that Technical Plating was to "ship the finished Parts directly to Kenmode's customer." Compl. ¶ 19. Technical Plating admitted this allegation in its Answer. ECF No. 15 at 2 ¶ 6. The parties now agree that Technical Plating shipped the Parts to Kenmode. *See* ECF No. 65 at 4; ECF No. 71 at 4. At summary judgment, nothing hangs on this issue.

ECF No. 72-2 ¶ 10.  Technical Plating's examination determined that the "root cause" was "the old rectifiers," ECF No. 73 at 2, which were "not sensitive enough to detect the actual amperage of . . . the plating thickness to plate," ECF No. 73-9 at 75:5–9; *see* ECF No. 72-3 at 25:2–4 ("[A rectifier] is an AC to DC power unit that's used for metal finishing."). Technical Plating replaced the rectifiers.  ECF No. 73 at 3; ECF No. 73-9 at 75:10–14. However, Technical Plating's admissions locate the problem not in the thickness of the metal plating, but in its application.  ECF No. 73-8 at 4.  According to Technical Plating, Kenmode's "specifications for the thickness of the Parts was [sic] well below the industry standards for soldering, which resulted in the failure."  *Id.*  Brian Vang, a quality engineer at Technical Plating, inspected the retains of the Parts, and he testified that "the thickness called out for soldering is outside of what Kenmode was requesting for on their prints." ECF No. 73-9 at 14:23, 24:15–25:24, 33:14–16.

*Technical Plating issued credits to Kenmode.*  From December 17, 2023, to September 30, 2024, Technical Plating issued credits to Kenmode, which totaled $77,979.83.  *See* ECF No. 15 at 7 ¶ 11; ECF No. 16 at 3 ¶ 11 ("Kenmode states that Technical Plating applied a credit in the amount of $77,979.83 . . . ."); ECF No. 15-3 (showing the credits with dollar values and dates); ECF No. 67-1 at 65:17–24 (acknowledging receipt of the credits).  Technical Plating "provided these credits to Kenmode in order to cover any possible liability Technical Plating had for the allegedly defective parts, as well as to attempt to maintain a working business relationship between Technical Plating and Kenmode."  ECF No. 66 ¶ 4.  On July 1, 2024, Technical Plating issued a written credit memorandum ("Credit Memo") to Kenmode "in the amount of

5

$436,327 . . . , to apply [to] future invoices for future products plated by [Technical Plating]." ECF No. 72-2 ¶ 14. Technical Plating informed Kenmode by email from the "TPI Accounting" address and signed by Technical Plating's office manager, Verna Keiser, saying, "Here is the credit . . . . I will apply invoices to this credit." ECF No. 73-4 at 3; *see* ECF No. 72-1 at 21:13–18. Technical Plating's President, Bryan Thomas, was copied on that email. ECF No. 73-4 at 3; *see* ECF No. 72-1 at 7:21–24. Ms. Keiser was authorized to issue credit memos without any monetary limits. ECF No. 72-1 at 22:5–16. The Credit Memo's "Description" section notes that it is "Credit for Chargeback Amount - various Orders with Plating Issues." ECF No. 73-3 at 2. The "Shipped Part" box lists the identification code for the Parts. *Id.*; ECF No. 1-3 at 2.

*There is a dispute about whether Technical Plating intended to send or honor the Credit Memo.* Kenmode's director of purchasing, James Shotsberger, testified that he and Mr. Thomas exchanged two calls about the credits in February and July 2024. ECF No. 73-5 at 5:23–25, 7:7–24, 9:9–12. According to Mr. Shotsberger, in the first call Mr. Thomas did not say anything about a credit memo, but said he would "make [Kenmode] whole and make it right." *Id.* at 9:1–6. In the second call, Mr. Thomas "explicitly stated that he was applying the credits against the 436,000." *Id.* at 10:14–16. In neither call did he state that he would not honor the Credit Memo. *Id.* at 13:3–7. Mr. Thomas saw it differently. He could not remember any phone calls with Mr. Shotsberger. ECF No. 72-1 at 93:9–11. He testified that he did not authorize Ms. Keiser to issue credit in that amount; instead, he intended to provide an "open credit memo" while Technical Plating determined what the exact amount would be. ECF No. 72-1 at 22:4–16, 23:17–24:9. After Ms. Keiser

6

sent the Credit Memo, Mr. Thomas was "a little in shock," ECF No. 78-1 at 20:15–18, and he determined she would not issue any more credit memos, ECF No. 72-1 at 24:18–23.

*Kenmode requested that Technical Plating sign an accommodation agreement, but Technical Plating did not sign it.* On June 24, 2024, a Kenmode representative sent an accommodation agreement to Mr. Thomas. ECF No. 79 ¶ 3; ECF No. 79-1. Under that agreement, Technical Plating would "agree[] to reimburse Kenmode for the Chargeback Amount" of $436,327 and rework the defective Parts.[4] ECF No. 79-1 at 4. Technical Plating never signed the accommodation agreement. ECF No. 79 ¶ 4.

*Technical Plating disavowed the Credit Memo.* On July 16, 2024,[5] Mr. Thomas sent a letter to Kurt Gascho, Kenmode's Vice President of Finance. ECF No. 73-6 at 2. In that letter, Mr. Thomas stated that "Technical Plating is willing to rework the parts at our expense." *Id.* He also noted that Technical Plating had received the accommodation agreement, was aware that Kenmode was requesting $436,327 in damages, and had submitted the claim to Technical Plating's insurer. *Id.* The insurer rejected that claim "[a]fter months and months and months." ECF No. 72-1 at 82:1–6. Around September 2024, Technical Plating "disavowed the Credit Memo and abruptly refused to supply its plating application to any further parts for Kenmode." ECF No. 72-2 ¶ 20; *see* ECF No.

---

[4]   Ms. Keiser did not get the dollar value of the Credit Memo from the accommodation agreement, but from an "Excel sheet" or "email" that is not in the record. ECF No. 78-1 at 23:10–20; ECF No. 72-1 at 90:20–24. Ultimately, the amount was the chargeback from Kenmode's customer, which Kenmode repaid in full. ECF No. 67-2 at 15 ¶ 21; ECF No. 67-1 at 66:17–25.

[5]   This letter is dated July 16, 2023. At oral argument, the parties explained that the year was a typographical error.

73-8 at 5 (admitting that Technical Plating rescinded the Credit Memo). In the end, Technical Plating provided $77,979.83 in credits to Kenmode. ECF No. 15 at 7 ¶ 11; ECF No. 16 at 3 ¶ 11.

*Kenmode filed suit and Technical Plating counterclaimed.* Kenmode brought four causes of action. They are breach of contract, Compl. ¶¶ 39–44, breach of express warranty, *id.* ¶¶ 45–48, breach of the warranty of merchantability, *id.* ¶¶ 49–57, and breach of the warranty of fitness for a particular purpose, *id.* ¶¶ 58–62. All the breaches concern the alleged defects in the Parts' plating; Kenmode does not claim that rescinding the Credit Memo was a breach of duty. Technical Plating counterclaimed for a declaratory judgment, seeking to establish that it already satisfied its liability to Kenmode. ECF No. 15 at 8–9 ¶¶ 14–20.

## II

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

"The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. When, as here, there are cross-motions for summary judgment, each side receives the benefit of this rule in response to the other side's motion. *See, e.g.*, *Fjelstad v. State Farm Ins. Co.*, 845 F. Supp. 2d 981, 984 (D. Minn.

2012).  When considering Technical Plating's motion, the record must be viewed in the light most favorable to Kenmode, and when considering Kenmode's motion, the record must be viewed in the light most favorable to Technical Plating.  *See id.*

III

The parties agree that Minnesota law applies.  *See* Compl. ¶¶ 51, 55, 61 (citing Minnesota statutes); ECF No. 65 at 6; ECF No. 71 at 8; *see also Netherlands Ins. Co. v. Main St. Ingredients, LLC*, 745 F.3d 909, 913 (8th Cir. 2014) ("Because the parties do not dispute the choice of Minnesota law, we assume, without deciding, Minnesota law applies . . . .").

In Minnesota, "[t]he primary goal of contract interpretation is to determine and enforce the intent of the parties." *Staffing Specifix, Inc. v. TempWorks Mgmt. Servs., Inc.*, 913 N.W.2d 687, 692 (Minn. 2018) (quoting *Motorsports Racing Plus, Inc. v. Arctic Cat Sales, Inc.*, 666 N.W.2d 320, 323 (Minn. 2003)).  Contract terms are "given their plain and ordinary meaning" and read in context of the whole contract.  *Motorsports Racing Plus, Inc.*, 666 N.W.2d at 323–24.  "Interpretation of unambiguous contracts is a question of law for the court, as is the determination that a contract is ambiguous." *Staffing Specifix, Inc.*, 913 N.W.2d at 692.  If a contract is ambiguous, its interpretation is a question for the factfinder.  *Denelsbeck v. Wells Fargo & Co.*, 666 N.W.2d 339, 346 (Minn. 2003).  "A contract's terms are not ambiguous simply because the parties' interpretations differ." *Staffing Specifix, Inc.*, 913 N.W.2d at 692.

9

A

Minnesota statutes govern the enforceability of remedy-limiting provisions in a contract. Courts may refuse to enforce unconscionable provisions generally:

> (1) If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

> (2) When it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose and effect to aid the court in making the determination.

Minn. Stat. § 336.2-302. "An unconscionable contract is one which no man in his senses and not under delusion would make on the one hand, and no honest and fair man would accept on the other." *Residential Funding Co. v. Terrace Mortg. Co.*, 725 F.3d 910, 917 (8th Cir. 2013) (citation modified). "To establish unconscionability, a party must demonstrate that it had no meaningful choice but to deal with the other party and to accept the contract as offered." *Id.* (citation modified). The Minnesota Supreme Court "has never explicitly formulated an approach for determining whether a contract is unconscionable," *Maslowski v. Prospect Funding Partners LLC*, 994 N.W.2d 293, 306 (Minn. 2023) (Moore, J., concurring), but courts applying Minnesota law generally require "the party asserting unconscionability [to] show that the contract is both procedurally and substantively unconscionable," *Carlson v. BMW Fin. Servs. NA, LLC*, 762 F. Supp. 3d 820, 826

10

(D. Minn. 2025) (citing *Butler v. ATS Inc.*, No. 20-cv-1631 (PJS/LIB), 2021 WL 1382378, at *19 (D. Minn. Apr. 13, 2021)).

Parties may also limit or exclude consequential damages "unless the limitation or exclusion is unconscionable. Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable but limitation of damages where the loss is commercial is not." Minn. Stat. § 336.2-719(3). In Minnesota, consequential damages "include[] any unmitigated losses resulting from a seller's failure to live up to general or particular requirements that the seller at the time of contracting had reason to know." *Far E. Aluminium Works Co. v. Viracon, Inc.*, 27 F.4th 1361, 1365 (8th Cir. 2022) (citation modified); *see* Minn. Stat. § 336.2-715(2)(a). Limitations on consequential damages, when made between merchants with "no great disparity in their bargaining strength and where the claim is for commercial loss," are not unconscionable. *Int'l Fin. Servs., Inc. v. Franz*, 534 N.W.2d 261, 269 (Minn. 1995); *Transp. Corp. of Am., Inc. v. Int'l Bus. Machines Corp.*, 30 F.3d 953, 960 (8th Cir. 1994) ("An exclusion of consequential damages set forth in advance in a commercial agreement between experienced business parties represents a bargained-for allocation of risk that is conscionable as a matter of law.").

Additionally, a liability limitation may be unenforceable "[w]here circumstances cause an exclusive or limited remedy to fail of its essential purpose." Minn. Stat. § 336.2-719(2). "When a sale of goods is between merchants, if the limited remedy fails of its essential purpose, the consequential damage exclusion is still valid unless it is

11

unconscionable." *Dart Transit Co. v. Paccar, Inc.*, 768 F. Supp. 3d 960, 972 (D. Minn. 2025) (citation modified)).

Parties may agree to liquidated damages for breach, "but only at an amount which is reasonable in the light of the anticipated or actual harm caused by the breach, the difficulties of proof of loss, and the inconvenience or nonfeasibility of otherwise obtaining an adequate remedy." Minn. Stat. § 336.2-718(1). In Minnesota, "'liquidated damages' signifies the damages the amount of which the parties to a contract stipulate and agree, when the contract is entered into, shall be paid in case of breach." *See Frank v. Jansen*, 226 N.W.2d 739, 743 (Minn. 1975) (quoting *Schutt Realty Co. v. Mullowney*, 10 N.W.2d 273, 276 (Minn. 1943)). In the ordinary case, the amount is fixed at the time of the contract, *see, e.g.*, *id.* at 742 (treating $2,000 downpayment as liquidated damages), or calculated as a fixed amount per day, *see, e.g.*, *Eng'g & Constr. Innovations, Inc. v. Bradshaw Constr. Co.*, No. 20-cv-808 (ECT/TNL), 2024 WL 5040395, at *33 (D. Minn. Dec. 9, 2024). The Minnesota Supreme Court

> has held that where the actual damages resulting from a breach of the contract cannot be ascertained or measured by the ordinary rules, a provision for liquidated damages not manifestly disproportionate to the actual damages will be sustained. On the other hand, when the measure of damages resulting from a breach of contract is susceptible of definite measurement, we have uniformly held an amount greatly disproportionate to be a penalty.

*Gorco Constr. Co. v. Stein*, 99 N.W.2d 69, 75 (Minn. 1959) (footnotes omitted); *accord In re Bowles Sub Parcel A, LLC*, 792 F.3d 897, 901 (8th Cir. 2015). "The controlling factor, rather than intent, is whether the amount agreed upon is reasonable or unreasonable in the

light of the contract as a whole, the nature of the damages contemplated, and the surrounding circumstances." *Gorco Constr. Co.*, 99 N.W.2d at 74. Further, "the major concern with liquidated damages provisions is unreasonably large liquidated damages." *Tharalson v. Pfizer Genetics, Inc.*, 728 F.2d 1108, 1112 (8th Cir. 1984). The official comments to the Uniform Commercial Code § 2-718 distinguish these scenarios and analyze them separately: "A term fixing unreasonably large liquidated damages is expressly made void as a penalty. An unreasonably small amount would be subject to similar criticism and might be stricken under the section on unconscionable contracts or clauses." U.C.C. § 2-718, cmt.1. Minnesota courts are not bound by the official comments, but those comments hold persuasive authority. *See Valley Paving, Inc. v. Dexter & Chaney, Inc.*, No. C2-00-361, 2000 WL 1182800, at *2 (Minn. Ct. App. 2000) (consulting Uniform Commercial Code comments to interpret Minnesota contract law); *In re EDM Corp.*, 431 B.R. 459, 465 (B.A.P. 8th Cir. 2010) ("While official comments to the UCC are not binding, they are persuasive in matters of interpretation."); *Thompson v. United States*, 408 F.2d 1075, 1084 n.15 (8th Cir. 1969).

Here, the damages cap unambiguously limits recovery to "the cost of direct labor and material of product loss directly damaged by our processing or two times our processing charges on such material, whichever is the lesser." ECF No. 1-2 at 2. The first calculation excludes consequential damages, and the second does functionally the same thing, precluding recovery beyond twice the direct damages. It is the second calculation that is at play. Technical Plating argues that the damages cap limits Kenmode's recovery to twice the processing charges, which comes to $39,298.38, and since Technical Plating

has already issued credits for $77,979.83, Kenmode has been fully compensated under the contract. *See* ECF No. 65 at 5.

The damages cap is an enforceable limitation of liability because it is not unconscionable. The agreement was for commercial services. Kenmode had lengthy experience negotiating contracts. *See* ECF No. 67-1 at 11:14–25. There is nothing in the record to suggest a disparity in bargaining strength. As a matter of law, the liability limitation is not substantively unconscionable. *See Franz*, 534 N.W.2d at 269; *Transp. Corp. of Am., Inc.*, 30 F.3d at 960. The record is bare as to the negotiation of the contract, so there are no facts suggesting procedural unconscionability. Kenmode argues that the damages cap fails of its essential purpose, ECF No. 75 at 9, but under Minnesota law, that is no reason to invalidate a consequential-damages exclusion in a contract between merchants over a "highly complex [and] sophisticated" "warranted item." *Viracon*, 27 F.4th at 1366.

The better read of the contract is that it does not contain a liquidated damages clause, so those rules do not apply. "A liquidated damages provision sets a fixed amount that can be recovered upon breach without proof of *any* damage." *Tharalson*, 728 F.2d at 1111 (citing *W. Union Tel. Co. v. Nester*, 309 U.S. 582, 587–88 (1940)). Here, the provision requires proof of damages. *See* ECF No. 1-2 at 2 ("Our liability for any cause is limited to the cost of direct labor and material of product loss directly damaged by our processing or two times our processing charges on such material, whichever is the lesser."). This is not the ordinary case where the damages are fixed by contract, whether for one amount or per day. It is true that some old or out-of-state cases analyze contracts that tether damages to

14

a variable other than time as providing for liquidated damages. *See Associated Cinemas of Am. v. World Amusement Co.*, 276 N.W. 7, 8 (Minn. 1937) (analyzing provision where a theater agreed "that as liquidated damages it would pay, in addition to the advance guaranty of $200, 'a sum equal to such percentage of the average daily gross receipts of such theatre during the period of thirty (30) operating days immediately prior to the date or dates when such photoplay should have been so exhibited'"); *Missouri ex rel. Nixon v. Prudential Health Care Plan, Inc. Cmty. Plan*, 221 F. Supp. 2d 1016, 1017–18 (E.D. Mo. 2002) (considering contract provision that stated, "liquidated damages *may* be assessed against the health plan in an amount equal to the costs of obtaining alternative health benefits for the member(s)"). But in *World Amusement* and *Prudential Health Care*, the contracts identified the damages-limiting provisions as liquidated damages—the instant contract does not. Kenmode cites no cases where a court applying Minnesota law treated a similar provision as a liquidated damages clause. And even if it were a liquidated damages provision, the better course would be to enforce it unless it is unconscionable, because it sets a low ceiling for damages. As a matter of law, it is not unconscionable.

There is no factual dispute that Technical Plating has satisfied its obligations under the liability limitation clause, so Technical Plating will be granted summary judgment on that issue. The parties agree that the processing charges are $19,649.19. ECF No. 67-3 (sum of right-hand column); ECF No. 67-1 at 41:22–42:2. There is no dispute Technical Plating provided $77,979.83 in credit to Kenmode. *See* ECF No. 15 at 7 ¶ 11; ECF No. 16 at 3 ¶ 11. The credits are more than twice the processing charges, so Technical Plating has

paid its damages, if in fact it breached.  Since the damages cap is enforceable, it will operate unless it is waived.

B

"Waiver is the intentional relinquishment of a known right."  *Frandsen v. Ford Motor Co.*, 801 N.W.2d 177, 182 (Minn. 2011).  "[T]he question of waiver is mainly a question of intention," *Farnum v. Peterson-Biddick Co.*, 234 N.W. 646, 647 (Minn. 1931), which "generally is a question of fact" for the jury, *Valspar Refinish, Inc. v. Gaylord's, Inc.*, 764 N.W.2d 359, 367 (Minn. 2009).  "When a party acts in a way that is inconsistent with the terms of a contract, a fact finder can reasonably conclude that a party waived those contractual provisions." *Id.*; *see Stephenson v. Martin*, 259 N.W.2d 467, 471 (Minn. 1977) (per curiam) (finding that waiver of subrogation right could be reasonably inferred from settlement agreement that did not expressly reserve the right); *Edelstein v. Duluth, M. & I.R. Ry. Co.*, 31 N.W.2d 465, 473–74 (Minn. 1948) (finding plaintiffs had waived enforcement of contract's notice provision by litigating on the presumption that it did not take effect), *overruled on other grounds by*, *Andrews v. Louisville & Nash. R.R.*, 406 U.S. 320 (1972).  "Although waiver can be express or implied, both types of waiver require an expression of intent to relinquish the right at issue." *Frandsen*, 801 N.W.2d at 182.  Waiver "must be manifested in some unequivocal manner."  *Manor Warehouse & Delivery, Inc. v. Gratton*, A17-1647, 2018 WL 2770469, at *3 (Minn. Ct. App. June 11, 2018) (quoting *Ohio Confection Co. v. Eimon Mercantile Co.*, 191 N.W. 910, 911 (Minn. 1923)); *see Slidell, Inc. v. Millennium Inorganic Chems., Inc.*, 460 F.3d 1047, 1056 (8th Cir. 2006).

16

"The burden of proving waiver rests on the party asserting waiver." *In re RFC & RESCAP Liquidating Tr. Action*, 332 F. Supp. 3d 1101, 1177 (D. Minn. 2018).

There is a factual dispute whether Technical Plating waived the liability limitation. Kenmode points to evidence from which a reasonable juror could infer that Technical Plating voluntarily relinquished its right to limit damages. Technical Plating issued the Credit Memo for $436,327. ECF No. 72-2 ¶ 14. It did so through Ms. Keiser, who was authorized to issue credit memos without any monetary limits. ECF No. 72-1 at 22:5–16. Mr. Thomas promised to "make [Kenmode] whole" and "explicitly stated that he was applying the credits against the 436,000." ECF No. 73-5 at 9:1–6, 10:14–16. And Kenmode applied credits in the amount of $77,979.83.[6] *See* ECF No. 15 at 7 ¶ 11; ECF No. 16 at 3 ¶ 11. On the other hand, Technical Plating pointed out Mr. Thomas was taken aback by Ms. Keiser issuing the Credit Memo, ECF No. 78-1 at 20:15–18, and that he intended all along to offer an "open credit memo" while Technical Plating determined the exact amount of damages, ECF No. 72-1 at 23:17–24:9. As he testified, Technical Plating "provided these credits to Kenmode in order to cover any possible liability Technical Plating had for the allegedly defective parts, as well as to attempt to maintain a working business relationship between Technical Plating and Kenmode." ECF No. 66 ¶ 4. Technical Plating never signed the accommodation agreement that formalized the terms of

---

[6] The parties have not argued whether issuing credits in the amount of $79,979.83 waived the liability limitation clause, or whether Technical Plating partially waived that provision. Kenmode expressly rejected the latter proposition. *See* ECF No. 81 at 6 ("When one waives or abandons a known legal right, it does not do so partially.").

the Credit Memo. ECF No. 79 ¶ 4. There is a genuine factual dispute whether Technical Plating waived its liability limitation.

Technical Plating argues that issuing the Credit Memo was merely a business "attempting to resolve an issue arising with the products it provided to another business," which, it believes, is "insufficient to prove an intentional relinquishment of a known right." ECF No. 77 at 15 (citing *Valspar*, 764 N.W.2d at 368). This reliance on *Valspar* is misplaced. In *Valspar*, the contract provided that the defendant would paint the plaintiff's products, and it included a provision requiring written notice of default. 764 N.W.2d at 363. When the plaintiff discovered defects in the paint job—uneven coats, blotchy texture, and mismatched colors, among other allegations—the defendant's representatives met with the plaintiff's "production personnel to resolve [the] oral complaints." *Id.* at 366. The court concluded that "cooperation between businesses to resolve product performance issues under a contract, without more, is insufficient to raise an issue of fact regarding waiver of express terms of an agreement." *Id.* at 368. It also noted that the contract "expressly contemplate[d]" the defendant taking such action. *Id.* at 368 n.5. This case is not *Valspar*. The credits did not attempt to "resolve product performance issues"—they offered compensation for potential liability. *Id.* at 368; *see* ECF No. 66 ¶ 4 ("[Technical Plating] provided these credits to Kenmode in order to cover any possible liability Technical Plating had for the allegedly defective parts, as well as to attempt to maintain a working business relationship between Technical Plating and Kenmode."). A reasonable jury could infer that Technical Plating's monetary offer waived a contractual limitation on monetary damages.

18

At oral argument—though not in its briefing—Technical Plating relied heavily on another case to stress this point, *KBJR, Inc. v. Radio Frequency Systems, Inc.*, No. 09-cv-1186 (DWF/LIB), 2011 WL 494881 (D. Minn. Feb. 7, 2011). *KBJR* offers stronger support, but it is also distinguishable. There, the court concluded there was no genuine dispute over waiver of a contractual "repair or replace" limitation when the seller attempted to fix the at-issue antenna and offered to absorb the cost of a replacement or provide credit towards another antenna. *KBJR, Inc.*, 2011 WL 494881, at *2, *4. The court construed the credit offer as the seller's attempt "to maintain its relationship with [the buyer] by going beyond its obligations under the sales agreement." *Id.* at *4. Here, Technical Plating attested to another motivation for issuing credits—it wanted to "cover any possible liability." ECF No. 66 ¶ 4; *see* ECF No. 73-5 at 9:1–6 (Mr. Shotsberger's testimony that Mr. Thomas said he would "make [Kenmode] whole and make it right"). On these facts, a reasonable jury could conclude that Technical Plating intended to waive its liability limitation.

Because there is a genuine factual dispute over waiver, summary judgment is inappropriate on that issue.

C

Technical Plating convincingly argues that there is a factual dispute about causation, an element of each claim of breach of contract, express warranty, and the implied warranty of merchantability. ECF No. 77 at 16; *see Reuter v. Jax Ltd., Inc.*, 711 F.3d 918, 920 (8th Cir. 2013) (stating that, to prevail on breach of contract, the plaintiff must show damages were caused by the breach); *Duxbury v. Spex Feeds, Inc.*, 681 N.W.2d 380, 393 (Minn. Ct.

19

App. 2004) (same for breach of express warranty); *Driscoll v. Standard Hardware, Inc.*, 785 N.W.2d 805, 816 (Minn. Ct. App. 2010) (same for breach of implied warranty of merchantability). In responding to Kenmode's requests for admissions, Technical Plating admitted it use an "incorrect application" on "some of the parts," and that its application "resulted in false readings of the plating's thickness," again for "some of the parts." ECF No. 73-8 at 4. But Technical Plating asserted that Kenmode's "specifications for the thickness of the Parts was well below the industry standards for soldering, which resulted in the failure." *Id.* Mr. Vang testified that "the thickness called out for soldering is outside of what Kenmode was requesting for on their prints." ECF No. 73-9 at 33:14–16. Kenmode does not address this argument in either brief supporting its summary-judgment motion. This factual dispute as to causation means summary judgment is not justified as to these claims.

The breach of the implied warranty of fitness for a particular purpose has slightly different elements, and though Technical Plating does not directly address that claim, it has shown a factual dispute there too. "Breach of an implied warranty of fitness for intended use requires proof that: (1) the seller had reason to know of the buyer's particular purpose; (2) the seller had reason to know that the buyer was relying on the seller's skill or judgment to furnish appropriate goods; and (3) the buyer's actual reliance." *Driscoll*, 785 N.W.2d at 817; *accord Willmar Cookie Co. v. Pippin Pecan Co.*, 357 N.W.2d 111, 115 (Minn. Ct. App. 1984); *see* Minn. Stat. § 336.2-315. Technical Plating's admissions establish a factual dispute whether it knew of Kenmode's purposes. *See* ECF No. 73-8 at 4 ("Technical Plating was unaware the Parts would be soldered."). Mr. Thomas testified that

20

in the "30-plus years" he had become familiar with several Kenmode customers, and they mostly used solderless connectors, and that he could not tell by looking at a quote whether the part would eventually be soldered or solderless. ECF No. 72-1 at 54:3–55:12. Kenmode argues that Technical Plating knew Kenmode's customer would incorporate the Parts as automotive components. ECF No. 71 at 14; *see* ECF No. 72-2 ¶ 4 ("Tech[nical] Plating was aware of the end-use of [the Parts]."). The contract documents, however, do not establish that element at the certainty required to grant summary judgment. *See* ECF No. 1-1 (making no mention of soldering); ECF No. 1-3 (same). So summary judgment is not appropriate on this claim either.

D

Finally, Kenmode moves for summary judgment on Technical Plating's Counterclaim for declaratory relief. ECF No. 71 at 20–21; ECF No. 81 at 9. The Counterclaim seeks a judgment declaring that "pursuant to the Contract, Technical Plating is not required to refinish the Parts free of charge, Technical Plating's maximum liability for the allegedly defective Parts is $39,298.38, and Technical Plating has already satisfied any liability to Kenmode for the allegedly defective Parts." ECF No. 15 at 9 ¶ 20. Technical Plating did not respond to the argument that this claim is impermissibly redundant.

Courts reject redundant declaratory-judgment claims as improper. *Mille Lacs Band of Chippewa Indians v. Minnesota*, 152 F.R.D. 580, 582 (D. Minn. 1993). "When deciding whether to dismiss a counterclaim as redundant, courts consider whether the declaratory judgment serves a useful purpose." *Great Lakes Gas Transmission Ltd. P'ship v. Essar*

21

*Steel Minn., LLC*, 871 F. Supp. 2d 843, 862 (D. Minn. 2012) (quoting *Gratke v. Andersen Windows, Inc.*, No. 10-cv-963 (PJS/LIB), 2010 WL 5439763, at \*3 (D. Minn. Dec. 8, 2010), *R. & R. adopted*, 2010 WL 5441940 (D. Minn. Dec. 28, 2010)).  "Such an analysis 'requires consideration of whether resolution of plaintiff's claim, along with the affirmative defenses asserted by defendants, would resolve all questions raised by the counterclaim.'" *Id.* (quoting *Gratke*, 2010 WL 5439763, at \*3).

Kenmode's motion for summary judgment will be granted as to the declaratory judgment Counterclaim for two reasons.  First, Technical Plating waived the claim by failing to respond.  *See Doll v. Trellis Walnut Towers LLC*, No. 24-cv-136 (ECT/TNL), 2024 WL 4355084, at \*3 (D. Minn. Sep. 30, 2024) (collecting cases).  Second, the Counterclaim serves no useful purpose, because resolving Kenmode's claims entails resolving the Counterclaim.  Technical Plating's Counterclaim essentially reprises its argument that the liability limitation clause is enforceable and the credits have satisfied any liability owed.  There is no need to send this redundant claim to trial.

## ORDER

Based on the foregoing, and on all the files, records, and proceedings herein, **IT IS ORDERED THAT**:

1.     Defendant and Counter Claimant Technical Plating, Inc.'s Motion for Summary Judgment [ECF No. 63] is **GRANTED IN PART** as follows:  The contract's liability limitation is valid and enforceable.  Technical Plating's motion is **DENIED** in all other respects.

22

2.    Plaintiff and Counter Defendant Kenmode Tool & Engineering, Inc.'s Motion for Summary Judgment [ECF No. 69] is **GRANTED IN PART** as follows: Kenmode is awarded summary judgment on Technical Plating's counterclaim for declaratory relief.  Kenmode's motion is **DENIED** in all other respects.


Dated:  April 22, 2026                                  s/ Eric C. Tostrud                       
                                                        Eric C. Tostrud
                                                        United States District Court